Good afternoon, ladies and gentlemen. The Court is convened in order to hear the motions that have been filed in the case of Alaska Wilderness League et al. Bruce's Kempthorne. We understand that the parties are ready to present arguments, so we will proceed. I believe the petitioners are first. Deirdre McDonald May it please the Court, my name is Deirdre McDonald and I'm here today representing the petitioners in Alaska Wilderness League v. Kempthorne and Red Oil v. Kempthorne. I'd like to address two issues today. The first one is the serious potential threat to an endangered species, the bowhead whale, which justifies continuation of this Court's stay and the failure to analyze this threat violates NEPA. The second issue I'd like to address is another issue that the MMS ignored in its environmental review process, the potential for a crude oil spill into this delicate Arctic environment. Mr. Winter, counsel for the North Slope Borough, will be splitting the time with me and he will address issues related to subsistence and the conflict avoidance agreement. The current iteration of exploration activities that Shell proposes at this time put both in location, scale and timing, put the industrial activity on a collision course with the bowhead whale migration path. I'd like to refer to a map that was included with the environmental assessment and is located in Petitioner's Urgent Motion to Stay as Exhibit 2 at page 93. This map shows the bowhead whale migration corridor. Each of the black dots on the map represent bowhead whale sightings that form a band across the coast of Alaska. The larger dots on the map represent drill sites. There's one that's just north of Point Thompson on the map and that one is a previous civil look site. This is the general vicinity of where Shell is planning to drill this fall. As you can see, this is right in the middle of the bowhead migration corridor and in addition is close off the coast of the Arctic National Wildlife Refuge. As is indicated in the record for this project, bowhead whales and in particular mothers with calves are sensitive to industrial noise in the marine environment and can be harmed by the types of activities that are going to be going on here in a number of ways. All that whales are migrating, industrial activity can push them further offshore at a great distance, keeping them out of preferred habitats, in particular near shore feeding areas where it's important for them to be able to feed on their migratory route. Does this record show that there are more, the food supply is closer to the shore, there's a greater food supply closer to the shore than there is farther out? Yes, it does. The record documents indicate that while this habitat is a migratory habitat, the whales do stop and feed on the way, on the migration path and it's in the near shore areas when the whales are feeding. In particular, whales have been known to stop near Flaxman Island, which is one of the barrier islands depicted on this map, and along the shore in the vicinity of Kaktovik. Other impacts in addition to keeping the whales from preferred feeding habitats of noise are that the industrial noise can mask the whales' calls, interfering with communications between whales. Whales also use sound to navigate, so this type of thing can potentially interfere with their ability to navigate and their ability, they use sounds to distinguish between thin ice that they can break through and multi-year thick ice flows where they can become trapped. Both the National Marine Fisheries Service and the National Research Council have stressed that mothers with calves are among the most sensitive of this population. The mothers with calves not only react strongly to noise, but feeding is more important for this population because they're nutritionally stressed and need to stop and feed more often. In addition, they have emphasized that all efforts should be taken to avoid disruptions that could potentially separate dependent calves from their mothers. The sound fleeing from the noise and the masking of calls has the potential to separate the calves from their mothers. Weren't there some earlier studies done on the impact of noise, etc., on the bowhead that were updated by the EA? What the EA focuses on is a past project that was conducted in this vicinity, but it differs from Shell's project. It focuses on this one drilling that was done with one drill rig, not the two drill rigs that will be present here, and that was used, there was relatively little ice management involved with that project. Are you talking about the 1993 project? Yes, I am. The Kovlum project. Is that the only project that has been studied previously? No, there are studies. Before approval. I understand it's a tiered approach, and so they're tiering off some of these other studies. So other than that icebreaking study, what other studies did MMS do? Well, I don't know what studies were particularly conducted by MMS, but various sources, such as the biological opinion that was prepared by the National Marines Fisheries Services in 2006, cites various studies. I think Richardson is one of the most recent studies that reports on noise deflection of bowhead whales. There are other studies. In addition, there's the Programmatic Environmental Assessment for Seismic Activity, and now the draft Programmatic Environmental Impact Statement for Seismic Activity, also cite many of the studies of bowhead whales that indicate that they're more sensitive to sound than was previously understood. The newest information is that they deflect almost universally at a distance when the received sound level is at 114 decibels, which is much lower than what was previously believed. So your position is that MMS did not adequately take those new studies into account? Yes, and what MMS failed to do here is look at the site-specific nature of this proposal with the two drill rigs, which will be within miles of each other. They'll be approximately three to seven miles apart. There'll be two drill rigs. There'll be four icebreakers. There's also, within the general vicinity, there'll be another 200-foot ship that's fitted to drill boreholes that will be active, plus supply ships going back and forth. In addition to that, and that's what's part of this exploration plan, Shell also proposes to conduct seismic activities in the Beaufort Sea this fall within the same timeframe. And so this is what they needed to look at was this unprecedented level of activity and the specific location right in the middle of the migration corridor. Now, help me as to what you are asking for a stay of the activity. That's correct. It has been approved. Now, it is August. Right. The government can help us out with this, too, but what is the season for doing this drilling? Do you understand that? It's my understanding, as Shell has informed the court, it now plans to begin its drilling in mid to late September and will continue as long into October as it can before the conditions, the ice conditions, make it too difficult for it to proceed. The timing of the activity in this current iteration is actually of great concern to the petitioners. There's an exhibit in Petitioners' Urgent Motion for Stay at Exhibit 2. Again, this is the EA at 98. There's a figure. It's Figure 10, and that shows the timing of the bowhead whale migration. And as you can see from that figure, the migration begins to peak in mid-September, right when Shell will be initiating all these activities. In addition, the most sensitive portion of the population, the mother with calves, tend to be on the tail end of the migration. According to the biological opinion that was published in 2006, the mother-calf pairs are most common from mid-September into mid-October. So you're asking for a stay pending hearing on the merits in this court? Yes. Yes, that's correct. This has not been briefed on the merits yet. That is correct. I think it's our hope, and I assume all the parties hope, that the merits will be resolved before next summer season. That was the question. When does the season start again? I assume that Shell will be prepared to move on the schedule it had initially proposed, which would have it moving things into location by July and starting its drilling as soon as conditions permit. Well, my understanding from the record is they've already moved some drill ships into location? Yes. They've moved them into location for this season. I don't know. I think that's a question for Shell. I don't know where they'll store them in the winter, but they'll take them away during the freeze-up and bring them back for next year. In any event, you want the merits of this resolved by the next summer, and you want all drilling stayed between now and then? That's correct. Yes. Is it just drilling you want stayed, or you want all? I mean, are you asking for more? Because I understand there's various steps in the project before we get to drilling, just moving the boats and getting lined up. Right. Well, the boats have already been moved. We were concerned about the spring migration, and the Norsell Borough and the subsistence petitioners were concerned about the spring whale hunt. The boats have already been moved through the Chukchi and the Beaufort, so the current concern would be with the drilling activity. And I don't think there would be a reason except to move them to home ports to move the boats other than to set them up to drill. Briefly, these problems that I've described with the bowhead migration and the potentially serious impacts to bowheads were universally recognized by the agency's own experts. The records show that the agency's biologists, Ms. Lewandowski, Dr. Monette, Dr. Gleason, Mr. Wilder, all expressed concerns about potentially significant impacts on the bowhead whales. In the environmental assessment, instead of disclosing and analyzing those concerns, the EA swept them under the rug. MMS, in its hurry to get this process done, just looked at that previous operation involving one drill rig instead of doing an analysis of this unprecedented level of activity. In the end, all that the MMS has to fall back on is the fact that there'll be a separate process under another statutory scheme conducted by a different agency that may adopt mitigation measures when it's complete. There's no analysis in the EA of what those mitigation measures will be and how effective they'll be. There couldn't be, because the permit they're relying on wasn't even proposed when MMS made its final decision approving the exploration plan. Indeed, the final permit still does not exist. I'd like to briefly talk about the oil spill claim and then leave the remainder of the time to Mr. Winter. But similarly, the rush to do this analysis precluded MMS from considering the potentially catastrophic effects of crude oil spilled in the environment. What they did analyze in this context was just a diesel spill, which is quite different from crude oil. And they said they did that because a small diesel spill was likely to occur. NEPA, however, doesn't require the agency to only analyze things that are more likely than not. It requires the agency to analyze things that are reasonably foreseeable. An oil spill in an oil spill in oil exploration drilling is clearly reasonably foreseeable. There are contingency plans in place. There are oil response boats associated with them because an oil spill can be anticipated. The EA, however, didn't analyze the specifics of what the response would be, what would the effect be of oil spilled in this location in the migratory corridor, how effective could a response be. It's known that skimming does not work in the Arctic environment most of the year. It doesn't work in spring breakup, and it also doesn't work during the fall freeze-up. So given that, the only thing that they're likely to rely on is burning the oil in place. But there's no analysis in the EA of what burning oil would mean for the resources at stake and for the communities. I'd like to leave the remaining time to Mr. Winker. Thank you. Good afternoon. My name is Chris Winter, and I represent the North Slope Borough and the Alaska Eskimo Whaling Commission, who have unique but overlapping concerns and interests in this case. I'd like to briefly touch on three topics for the Court this afternoon. The first is I'd like to discuss the conflict avoidance agreement and provide a response to Shell's recent filings. The second point is that I would like to reiterate the North Slope Borough's and the Whaling Commission's concerns about the continuing threat posed to the bowhead whale from drilling operations in August and September and October. And finally, I would like to discuss the harm posed to other subsistence resources that the Minerals Management Service failed to consider in the environmental assessment and which pose a significant threat to my clients' interests. First, with respect to the conflict avoidance agreement, Shell and the Alaska Eskimo Whaling Commission have signed the conflict avoidance agreement. Those parties are in discussions regarding full implementation of the terms of the conflict avoidance agreement. Depending on the outcome of those discussions, the Whaling Commission's position on the request for stay as it relates to this season's hunt may change. If that happens, we'll notify the Court. At this point, the Whaling Commission's position has not changed. North Slope Borough is not a party to the conflict avoidance agreement, and its position with respect to the urgent motion for stay and the threatened harms has not changed and will not change as a result of the conflict avoidance agreement. What exactly is this conflict avoidance agreement? Is this a settlement? No. Well, the conflict avoidance agreement was a preexisting process between the Whaling Commission and the villages on the North Slope, and it applies to all of the offshore operators, including Shell and the other companies that operate offshore. And it was established as a process to try to resolve potential conflicts. And Minerals Management Service required that Shell engage in that process with the Whaling Commission and the boroughs for this exploration plan. And there had been no agreement on that conflict avoidance agreement until just recently,  and now the Whaling Commission and Shell are in discussions, which now are essentially settlement discussions because we have this litigation, as to how that agreement affects the Whaling Commission's current pending request for a stay as it relates to this season's subsistence hunt. Given that situation, the North Slope Borough and the Whaling Commission concur with the arguments we just heard from the other petitioners. The proposed drilling activities in September and October present a very significant threat and an imminent threat to the health of the bowhead whales. The North Slope Borough and the Alaska Eskimo Whaling Commission have worked for many years, and indeed decades, in partnership with the federal government to manage the bowhead whale population, and they have done so in an interest in ensuring a sustainable population level so that they can sustain their traditional subsistence lifestyle. The significant level of exploration, including multiple drilling rigs, at least four icebreakers, a borehole drilling vessel, and all the associated support vessels in the middle of the migration at the time when the mothers and calves are moving through, which is in September and October, presents a very significant threat to bowhead whales. The Conflict Avoidance Agreement does not address that threat, and the Borough and the Whaling Commission continue to be very concerned about the activities. Furthermore, the proposed exploration activities also threaten significant and irreparable harm to several other subsistence resources, and these include caribou, beluga whales, seals, seabirds, and migratory fish. The Minerals Management Service did not conduct any analysis in the environmental assessment of the impacts to these other subsistence resources that provide important and irreplaceable roles in the subsistence diet and traditional lifestyle of the Inupiat. Just as a quick example, I'd like to look at the caribou. MMS's analysis of impacts to caribou in the environmental assessment consists of a single sentence, and this is at page 38 of the environmental assessment, and I'll quote, Onshore, helicopter and aircraft supply flights have the potential to disturb caribou movements and alter the subsistence hunt. So as a factual matter, MMS has admitted that these activities can alter the subsistence hunt, but that is the only sentence and the only analysis of the potential impacts to my clients. The single sentence not only demonstrates the threat of harm, but it demonstrates MMS's failure to adequately take a hard look at these potential impacts before approving the exploration plan. The analysis with respect to beluga whales, seals, and fish, all, again, key subsistence resources, is similarly inadequate. The agency's experts express concern about impacts to these resources. This is Exhibit 118 at page 26, which is a draft of the EA prepared by Mr. Wilder, in which he said that the icebreaker noise could result in these types of impacts to subsistence resources, but that Shell had not provided enough information on icebreaker noise on which to base an analysis of the potential impacts. That language was changed in the final document that was released to the public. So in conclusion, the significant level of harm that's documented in the record to these other subsistence resources, as well as to the bowhead whale migration, has the potential both to result in irreparable harm to my clients and documents the potentially significant impacts that require the preparation of an environmental impact statement. We would ask, again, that the Court look at the National Parks Conservation Association case v. Babbitt at 241F3-722, in which this Court said the hard look must be taken before and not after the actions are put into effect. Thank you. Your time has expired. We'll give you a minute on rebuttal if you – is there something urgent that you – in this urgent motion that you think you wish to add? Thank you. May it please the Court, I am David Shulton, representing the Minerals Management Service here. I'll be taking about 13 minutes and reserving about seven for Mr. Parker, who's representing Shell, the intervener. I think that particularly in light of the conflict avoidance agreement, which has been mentioned here, that petitioners here cannot make the necessary showing for a stay pending the time it takes to resolve the merits of this case. And I think we're all thinking that we can get the merits resolved. We're hoping we can before next open water season starts. When is that? When does the next open water season start? Well, I think Shell would hope to get out in early July, as they had hoped to get out this year. Obviously, they won't be out this – A little more global warming, you might be able to start earlier. Well, the ice – as the EA notes, recently the ice has been thinner, and it appears to be thinner this year. It's definitely a concern. But I think the only possibility of non-speculative harm here really was the possibility of adverse impact on subsistence whalers who have traditionally whaled east of Cross Island. What about to the whales themselves? Well, that is also a concern. But as the EA shows, and as the multisale EIS shows, that the fact that whales may divert somewhat to avoid the noise doesn't have any impact on the whales, because this is not an important feeding area for the whales. They are basically migrating through the area. Am I reading the right thing? There seems to be – there's a statement that they would experience temporary non-lethal effects, which covers a variety of things. Right. And that is why the MMS has required Shell to get an incidental harassment authorization. And that is a process whereby if there are any non-lethal, non-injuring effects which affect behavior, that's considered a take under the Marine Mammal Protection Act. And so Shell has to get an authorization to do that. And that process is now pending before National Marine Fisheries Service. So do you call disorientation and inability to feed in the – where they would otherwise feed? What is that? That would be harassment. It's considered, legally, harassment because it affects a behavior. But that goes in another box, in another permit. Is that what you're saying? It is controlled by the NIMS permit. It's considered, certainly, by MMS in the environmental assessment. But what MMS concludes is because the incidental harassment authorization process is so protective, NIMS can only grant that permit if Shell can show that there will be a negligible effect on the whales, that that is protective enough that MMS can decide that there is no significant impact on the whales. And if – I mean, the NIMS process is also one that has gone in several phases. While they're looking at the incidental harassment authorization application now, they did a biological opinion in 2006, which is in the record, which considered generally whether exploration in the Beaufort Sea would have any jeopardizing effects on the bowhead since they're an endangered species and found that it would not. And I think it – Well, it is for the Beaufort Sea. Well, for the – that's a big place. Right. But it considered – it was sparked by the particular leases which Shell has acquired in the three lease sales. Now, those leases cover a fair area. But I think the areas where the leases are are all pretty similar as far as their impact on the whales generally. It just seems like we keep moving this off. You know, the leases, well, then they have to get a permit to drill. But when – but we're going to approve the drilling, except that you need to have further approval for harassing the whales. But then we keep getting farther along the line. We never actually come to grips with what's going on to the whales. Well, the incidental harassment authorization will look at this precise exploration that Shell has proposed here. So it is very – It stopped the exploration? If Shell cannot – if Shell does not get that authorization, it cannot drill. Does it have it now? Pardon? Does it have it now? No. So when is it – when is it contemplated that Shell is going to get this authorization? I think everyone thought it would be finished by now, the process, but it has not. It's pending. So instead, it's still pending. Right. And we're now about to reach the height of the migratory period, September and October. And what, we're going to get this authorization in September or October, and that's when Shell's going to start drilling? Right at the height of the problem? Well, Shell can't start drilling until the – until Newitzik, which whales in this area, has finished its whale hunt. That's the conflict avoidance agreement. Let me ask you, this is a – you know, obviously, this is a stay pending hearing on the merits. So the standard is a traditional kind of balancing of hardships. And I guess what I'm – where my question is focused is, what's the hardship if we stay this pending a hearing on the merits, where people can really thoroughly look at this, if Shell can't drill anyway, because it hasn't gotten the other licenses and authorizations that it needs to get to be able to drill? Well, the presumption is that these other authorizations will fall into place before the middle of September. You're right. If NIMS did not grant an incidental harassment authorization, then they could not proceed. But they haven't granted it. You're right. So I'm going to decide today whether or not the stay pending appeal should be issued. So I'm looking at the hardships right now as we're discussing them. What's the hardship if they can't drill anyway? Well, I think the way to look at it is that if Shell is barred from drilling, they incur a lot of financial harm, plus the policy of the Intercontinental Shelf Lands Act is interfered with. But I think this Court, looking at it from today's perspective, can say that if NIMS grants the incidental harassment authorization between now and September, it means that the expert agency has concluded that the whales are not going to be harmed. So I think you can deny the stay and know that on the one hand, if NIMS grants the permit, it will have decided there won't be any harm. If it denies the permit, then there won't be any drilling. Can I ask what you represent, MMS? Yes. What's your interest in whether or not we grant a temporary stay pending a hearing on the merits of this? It's basically the policy of the Intercontinental Shelf Lands Act where Congress has said it's in the national interest that there be expedited exploration of the Outer Continental Shelf, and it's MMS's job to carry out that policy consistent with protection of the environment. And how will you be harmed? How will the agency be harmed by a temporary stay? Well, one of the harms is that by allowing Shell to drill this season, we'll be getting a lot more information on a couple of things. One, on the marine mammals that are out there, because there are a lot of monitoring requirements. They are required to have monitors on the ships that are out there, on the drilling platforms, and there will be monitoring of the sounds that are made. So we'll get a lot of valuable information about the effects on the animals themselves. We'll also be getting valuable information about whether there's oil and gas out there. So I think exploration from our point of view. And you need this information tomorrow. Well. You can't wait until there's a hearing on the merits of this case. You know, it's better to get it sooner. I mean, our harm is not as immediate and severe, I think, as Shell's. And Shell can describe their harm. But I think as the Supreme Court's decision in Amoco Production versus Village of Gamble makes clear, that the policy of the OCSLA is important in these preliminary injunction type issues. And unless the petitioners can show some real non-speculative harm to resources, then an injunction really is inconsistent with that statute. And I think that given all of the protections, the IHA process, which protects all the marine mammals, the belugas, polar bears, as well as the whales, you've got the stipulations that were imposed by MMS that protect caribou by requiring that any helicopter or plane flights fly at a certain elevation and avoid the coastal areas. So all of these resources have been protected and studied quite extensively. This environmental assessment tiers to the environmental impact statement that was done for the three of these sales in this area. And that's got a very thorough consideration, not only of the noise potential, but also of the You're talking now about the 1993 study? No, this is a 2003 environmental impact statement, which certainly looked back at the drilling that was done in 1993 because that was exploratory drilling that was done in this same area, in fact, with this very same vessel. So that was very relevant information. And it indicates, I think, that exploratory drilling in the Beaufort Sea is certainly not a new or novel kind of activity. It's been done quite a bit. As the EA points out, there have been 35 exploratory wells in this area of the Outer Continental Shelf. And based on the record of drilling in Alaska, as well as other areas of the Outer Continental Shelf, the possibility of an oil spill is negligible. There have only been four blowouts. You're talking about a spill. This is another thing. Some of us have some experience with oil spills, too. You're talking about a spill from the, from what? From the exploratory drilling. From the exploratory drilling. Right. And down the line when they explore, there's a risk of the, of the, of a spill from getting the oil out. Right. But we don't consider that now because that's down the line. That is. Yeah. But it was, but it was considered in the lease sale environmental impact statement. That looks at the whole process from, through exploration and development. And even though it finds that the chance of an oil spill happening even during the production stage is very small, it analyzed what would happen if there were an oil, a large oil spill at that time. It analyzed the resources that might be affected, analyzed trajectories starting from various possible spill points, including this area involved here. So that has been thoroughly looked at. And it will be looked at again if there is ever, we ever get to the production and development stage. But the exploration stage is a narrow slice here. We're just looking at exploratory drilling. And MMS is required by statute when it gets a exploration plan to act on that within 30 days. This is part of the whole expedited procedure that Congress imposed. And I think it's very reasonable in light of the fact that it had already done an EIS on all three lease sales, and will do another if there's production, to do an environmental assessment here in the 30 days that it had and to look at all of the studies that have been done and to conclude based on all of the protections that there would not be a significant impact. Are you telling, you've used your 13 minutes, but are you telling us that there will be a complete EIS when, if they decide that they're going to do production? The statute requires that if you get to the production stage, that MMS declare that at least one production plan in the area is a major Federal action, which requires an EIS. So I think that means for this, for the Beaufort Sea, if there were a production plan, they would have to do an EIS. I don't think there's any way around that. Okay. Thank you. Thank you. Good afternoon. My name is Kyle Parker. I'm here today on behalf of Shell. I'd like to start off with your question that you just addressed to the government, Your Honor. The exploration work that's going on right now is going to facilitate our information gathering, the government's information gathering, which will be accumulated and added to the extensive existing body of information for preparation of an EIS, if we ever go to development. It is our expectation that there will be a full-blown environmental impact statement that will have to be prepared before we can take the Sewoolik project into development, if that ever happens in the future. That's not to diminish the fact that there already has been extensive environmental analyses conducted to support the multiyear or the multi-sale EIS and the three sales that were conducted pursuant to that and the EA that was prepared for our specific exploration project, which is tiered off of that multi-sale EIS. Even the Petitioners acknowledged that that was appropriate. Today we've heard a few specific issues brought up that I'd like to point the Court's attention to. One is that the multi-sale EIS contemplated significantly more activity than just the drilling activities, the exploration drilling activities that Shell is undertaking right now. And it also included site-specific analyses using the data that's been developed from the prior exploratory drilling activities in the Beaufort Sea, including the activities that happened in the immediate vicinity of where we are operating. So the site-specific analyses are out there. They were included in the multi-sale EIS. And our EA is tiered back to that multi-sale EIS. So the record is replete with information about the impacts of oil and gas, not only exploration activity, but even development activity on the resources that are found in the Beaufort Sea. The North Slope Borough addressed caribou specifically in their presentation today. And in multi-sale EIS, I would encourage the Court to look to section Roman numeral 5C8A1A, which goes at length to talk about the impacts of the offshore activities on the caribou herds onshore. So the studies have been done. The studies have been accumulated and were relied upon by the agency in reviewing and approving our EA for our exploration project. Okay. How – how – what's before us today, as Judge Wardlaw has said a couple – indicated a couple of times, is the stay pending the hearing on the merits of the appeal.  Of the petition. Now, how is Shell going to be hurt in any really meaningful way, given all of the risks of litigation that you go into when you embark on – on this kind of effort in – in pristine wilderness? What – how are you going to be hurt by a stay, assuming the Court gets – can get it decided by the next drilling season? Quite – quite simply, Your Honor, the – Shell has invested hundreds of millions of dollars in preparing for their exploration activities this year. The – the information that's gathered from their activities that – that they will conduct this year will be used to analyze and develop and design future exploration activities on – on the leases that it has. We've got a three-year plan of exploration, and in the Arctic environment in which we're operating, we have a very brief window of time from year to year in which to go and operate. The open water season is roughly 90 to 120 days. So it's from July to when? I'm sorry? The open water season is July to when? Roughly – roughly mid-July, and – and what controls that, quite honestly, is when the ice backs out from around Point Vero. And so mid-July till end of October, sometimes into early November. Before you can drill, you have to have a conflict avoidance agreement? Yes, Your Honor. Is that in place? We – we were able to achieve a conflict avoidance agreement with the Alaska Eskimo Whaling Commission just two weeks ago. That conflict avoidance agreement controls our activities so that we are not in interference with the subsistence hunt of the – of the migrating bowhead whales. Are – are there other parties that are necessary to have that be complete? No. No, Your Honor. In fact, the – the AEWC – Shell and the Commission. That's it. Well, and – and what the – what the AEWC does just by practice is it includes the – the affected whaling communities. And we have the agreement – the affected whaling communities, which are Barrow, Nuiqsut, and Captovic, have also signed on to the conflict avoidance agreement as well. Now, is there a final agreement, and has that been submitted to MMS? Yes, it has. And MMS has issued their letter finding that conflict avoidance agreement as satisfactory of lease stipulation number five, which requires Shell to have a – what's called a plan of cooperation or subsistence mitigation plan in place prior to its activities. Now, what about the incidental harassment authorization from an MFS? We – our – our application for what's called an incidental harassment authorization has been pending at the National Marine Fisheries Service for some time now. The National Marine Fisheries Service is in the process of reviewing that. We – we hope to receive that soon. When we get it, we can't say with any certainty. But we cannot operate, we cannot begin our drilling operations until we have that authorization in place. Which means that we don't know whether – see, this – we don't know whether you would be really harmed or not. We don't know when that's going to issue, if – if you – your season ends at the end of October, and we're talking two months now. Well, what – what we anticipate, Your Honor, is that we will have our incidental harassment authorization soon. I don't know what that means. I'm sorry. We can't even speak to what soon means. What about the letter of authorization, the LOA from Fish and Wildlife? We do not have our LOA either for purposes of our drilling operations. Have you even been told by them that it's forthcoming? Yes, we have. Let me – let me share with the Court. The fact that we don't have all these authorizations in place right now is not unusual. We had 34 separate major permit authorizations that we had to receive before we could begin our – begin our operations. We've been in the process of gathering all of those leading into operations. And this is not unusual that we find ourselves at this point without those in place. I think – yes, but I think there's some concern about how much impact a stay here is really going to have on you if there are these other contingencies that you're waiting on. If I might, Your Honor, here's a scenario addressing the IHA, which we've been discussing. We anticipate we will have our drilling IHA within weeks. Our operations, we've agreed, voluntarily agreed to defer our operations until after the end of the new exit way element, roughly mid-September to late September. We anticipate we will have our IHA in place in that time period. If the parties are still aggrieved with what the IHA says, there's a separate statutory regime under which they can challenge that. And as this Court noted in the Edwardson case where there's a specific statutory regime and an opportunity for them to challenge, if they are unhappy with what our IHA requires us, they can take that and challenge that in district court. You're over your time, and I know the Chief is mindful about time, so I just really need to stop you and ask you something that's troubled me about – and this probably goes more to the merits, but you have been conducting some activities. You've moved boats, right? You've moved things into place up there. You moved the boats through the two seas. And what this says, this February 15 authorization says no exploratory drilling activities. And I'm just wondering, how are you defining that? If I might, Your Honor, I think just to clarify the record, we have not moved any vessels onto location. We have no vessels in the theater, the Beaufort Sea, at this time. We had two vessels, our icebreakers, that transited the Beaufort Sea, which doesn't require any authorization. And isn't that one of your activities? No, not at all, Your Honor. This is simply a transit. Preparation for your activities? Well, we have a vessel that is in Canadian waters. It's the Culloch. It's over in McKinley Bay in Canadian waters. Two of our vessels, that is not a self-propelled vessel. That has to be towed to location. We had two of our vessels transit across the Beaufort Sea to go to be on point to move the Culloch at the point in time it's ready to go onto location. So it's not related to your exploratory activities? There's a distinction to be drawn between simple transiting and then the movement of vessels once the exploratory drilling operations have started. Our transiting activities don't require any authorizations from the MMS or from the Coast Guard or others. All right. So why does there seem to have been some kind of games playing about that earlier in the ---- Well, I guess from our view, there were no games played. We filed several declarations with the Court, and every single one of those declarations was consistent about what our activities were, what was going on. We were trying to be forthcoming with the Court about what was happening in regard to our project. So I think that it's not fair to suggest that we were playing games at all with what our activities were. The declarations of Chandler Wilhelm are consistent. I would encourage the Court to look to those. Thank you. Thank you. Do you wish to add anything? May I have 30 seconds to confirm this? Sure. Thank you. I'd like to just briefly address three things. The first one is the government, the MMS's reliance on this IHA, that incidental authorization. While the government says that the harms are speculative, it's actually the IHA itself that's speculative. We don't have an IHA. We don't know what it will look like. We don't know when it will be issued, what mitigation measures it will contain. The government attempts to fall back on the substantive standard of the Marine Mammal Protection Act, describing it as it's so protective that there could never be a need for an EIS when there's going to be an IHA. That's clearly not the law. Agencies prepare. If that was the law, agencies would never have to prepare an EIS to consider impacts to marine mammals, because all marine mammals are covered by the Marine Mammal Protection Act. The Marine Mammal Protection Act does not waive NEPA or create a per se rule that you never need an EIS. In addition, the National Marine Fisheries Service is not conducting its own NEPA process on the IHA. It has to rely on the EA that was conducted here, which doesn't analyze any concrete mitigation measures. One thing I'd like to point out with respect to the oil spills and the mention, there was a mention of four blowout spills. Those are four blowouts in exploratory drilling like we have here. The blowout is when the pressure is too great, the oil is too pressurized, so it comes out like the Santa Barbara spill was a blowout. And then, in addition, there was talk of the government indicated that there were no important feeding areas here. It's not a feeding area, but it is the migratory bath contains many areas where the whales stop to feed along the route. And I have some sites relative to that purpose. The biological opinion, which is Petitioner's Exhibit 24, the urgent motion for stay, at page 8, 13, and 14, on all those pages, has information relating to how bowheads stop to feed on the near shore areas along the migratory path. Thank you. Thank you. The matter just argued is submitted. That concludes the Court's calendar for this afternoon. The Court stands adjourned. Thank you.
judges: Schroeder, Hawkins, Wardlaw